UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Docket No. 2:17-cr-122-NT |
| | ) | |
| JOHN BILLINGS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

Before me is Defendant John Billings's motion to suppress the statements he made during the execution of a search warrant of his home and the digital evidence recovered from two cell phones found during the search. (ECF No. 33.) Mr. Billings argues that the officers coerced him into providing the passcodes to the two cell phones, violating his Fifth Amendment rights, and that in "seizing" the passcodes they exceeded the scope of the warrant. The Government contends that the statements made by Mr. Billings were not coerced and that the police did not "seize" the passcodes. For the following reasons, the Defendant's motion is **DENIED**.

**FACTUAL FINDINGS**

On February 23, 2017, at approximately 10:30 a.m., law enforcement officers executed a search warrant for all computers, electronic devices, and digital storage media at 24 Maplewood Avenue, Windham, Maine. Det. Stepnick of the Maine State Police Computer Crimes Unit sought the warrant after downloading a video containing suspected child pornography that was shared on a peer-to-peer network from a computer with an IP address assigned to 24 Maplewood Avenue. Det. Stepnick

was assisted in the search by seven to eight armed officers. Three or four were Homeland Security agents, who wore raid jackets. Det. Stepnick wore plain clothes with a badge, and his jacket concealed his firearm. The rest were uniformed Windham police department officers with visible firearms.

When the officers arrived at the house, they first encountered Lori Presby, Mr. Billings's wife, and then presented her daughter, Lacy Lee, with a copy of the search warrant. Mr. Billings was sleeping upstairs, and officers woke him and escorted him down to the living room. Det. Stepnick told Mr. Billings they were executing a warrant because someone in the house "was seen downloading files that they shouldn't have been downloading." Gov't's Ex. 1 ("**Stepnick Recording**") 04:20-04:27.[1] Det. Stepnick started to ask Mr. Billings questions about his use of any file-sharing network. Mr. Billings said he would like to smoke a cigarette. Det. Stepnick asked that he smoke outside. As they were looking for cigarettes and a lighter, Det. Stepnick told Mr. Billings, "[n]obody's under arrest here either, you can leave at any time . . . ." Stepnick Recording 04:53-05:00. Det. Stepnick also told Mr. Billings that Ms. Lee had a copy of the search warrant. After additional conversation, the following exchange occurred:

> Stepnick: Okay. Okay. We're doing an investigation, you're not under arrest or anything, but do you mind if we ask you some questions or talk about why we're here, or . . .
>
> Billings: I'd like to have a lawyer.

---

[1] Det. Stepnick testified that his recording device was inadvertently shut off approximately eight minutes into the recording. Det. Stepnick's testimony was the only evidence presented at the evidentiary hearing regarding what happened after that time.

Stepnick: Okay, okay, good enough. Um, then we won't talk to you anymore, then. Okay? Um, but we are going to take all the digital devices that are here, phones, computers, everything's going with us. Um, we were hoping to alleviate that, but we'll just take everything. And at some point you'll get it back. We're looking for child pornography.

Fife:[2] And there's a child living here.

Stepnick: And there's a child living here.

Fife: And that's a huge concern, you understand?

Stepnick: So do you have a phone on you, or is it in your room, or . . .

Billings: No.

Stepnick: Uh, no to what, you don't have it on you or it's in your room.

Billings: I have no phone.

Stepnick: Okay, okay. So we're gonna get Rescue for, is it your, the lady that's living here. Lori.[3]

Billings: Lori.

Stepnick: We're gonna get Rescue for her, she's having a little bit of, problems. And then we're going to rip the place apart and search it. And you can leave if you want, you can stay here if you want, it's totally up to you.

Billings: I'd like to get some sleep. I was up most of the night.

Stepnick: Well, you can, do you have a neighbor you can hang around with? Or is there a neighbor you can go sleep, or if you don't want to stay here, that's up to you, you're just not going to go to sleep while we're here.

Billings: Alright.

---

[2]     Special Agent David Fife, Homeland Security. Hearing Tr. 15:25 (Dec. 7, 2017).

[3]     Ms. Presby was manifesting signs of an anxiety attack, and so Det. Stepnick called for an ambulance. An additional officer of the Windham police department arrived with the medics. Hearing Tr. 13:25-14:13.

3

Stepnick Recording 06:50-08:04. Mr. Billings stayed in the house.

The officers searching the house found two phones—a Coolpad and a ZTE. Ms. Presby told Det. Stepnick she wanted to contact her doctor to reschedule an appointment she was missing. Holding the two phones, Det. Stepnick found Mr. Billings and asked him to enter the passcode so Ms. Presby could make a call to her doctor. Mr. Billings said he only used the Coolpad as a phone. Mr. Billings unlocked the Coolpad and told Det. Stepnick the passcode. Det. Stepnick took the phone, disabled the passcode setting, and put the phone in airplane mode. He then gave Ms. Presby her own phone to use.

Approximately 20 minutes later, Det. Stepnick approached Mr. Billings and asked him to enter the passcode for the ZTE. Det. Stepnick watched Mr. Billings unlock the phone. He asked Mr. Billings what the code was. Mr. Billings first told him that the passcode was "0630." Det. Stepnick pressed him, noting that Mr. Billings had entered a six-digit code, and Mr. Billings then stated that the code was "063072." Det. Stepnick then disabled the passcode setting on the ZTE and put it in airplane mode.

Based on evidence uncovered during the search, Det. Stepnick ultimately placed Mr. Billings under arrest for possession of sexually explicit materials. The search lasted no more than two hours.

## DISCUSSION

Mr. Billings seeks suppression under three theories: first, that his Fifth Amendment right to counsel was violated; second, that his statements were

4

involuntary; and third, that the scope of the search exceeded the warrant. I address each argument in turn.

I.  **Fifth Amendment Right to Counsel**

The Fifth Amendment guarantees that no person "shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Court

> concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

384 U.S. 436, 467 (1966). The Court held that the right to counsel, specifically, was "indispensable to the protection of the Fifth Amendment privilege" against self-incrimination. *Id.* at 469. The Fifth Amendment right identified in *Miranda* includes the right to have counsel present at any custodial interrogation.[4] *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (police may not question a custodial suspect who has invoked the right to counsel unless the suspect initiates the communication). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474. *Miranda* established that a suspect's statements are "presumed involuntary" when custodial interrogation continues after invocation of the right to counsel. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

---

[4]     The Sixth Amendment right to counsel attaches when formal proceedings begin against a defendant. *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972).

5

In *McNeil*, the Supreme Court commented that the *Miranda-Edwards* guarantee "relates only to custodial interrogation." *Id.* at 178. Thus, in order for the *Miranda* right to counsel to be triggered, a defendant must demonstrate that he was in custody at the time he made the statements he seeks to suppress. *United States v. Ellison,* 632 F.3d 727, 731 (1st Cir. 2010) ("even if [defendant] had clearly expressed a desire to speak with a lawyer, he could not have invoked any constitutional right to do that in a non-custodial interrogation conducted before he was formally charged."); *cf. United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011) ("The necessity vel non for *Miranda* warnings turns on whether a suspect is in custody."); *United States v. Foley*, 595 F. Supp. 2d 171, 176-77 (D. Mass. 2009).

"Custody" means that, in the circumstances of the interrogation, "there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Hughes*, 640 F.3d at 435. The test is whether, under the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The primary four factors for this inquiry include "(without limitation) where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation." *United States v. Guerrier*, 669 F.3d 1, 6 (1st Cir. 2011) (quoting *United States v. Teemer*, 394 F.3d 59, 66 (1st Cir. 2005)). "[A]n interrogation in a defendant's residence, without more, certainly weighs against a finding of custody." *Mittel-Carey*, 493 F.3d at 40. Officers "escorting a suspect

throughout his home may have some bearing on the custody inquiry," but the inference of physical restraint is weak where there is a lack of evidence that officers "followed the defendant so closely as to intrude upon any intimate moment or private activity." *Hughes*, 640 F.3d at 436.

Mr. Billings asserts that his Fifth Amendment right to counsel was violated when Det. Stepnick requested the passcodes to his mobile phones after Mr. Billings indicated that he wanted to have a lawyer present before he answered any questions. The Government maintains that because Mr. Billings was not in custody, the police were not obligated to stop questioning him.

Mr. Billings relies heavily on *Mittel-Carey* as support for his claim that he was in custody at the time of Det. Stepnick's questioning. There, the court found that an in-home interrogation during the execution of a search warrant for child pornography was custodial. *Id.* at 39. The dispositive facts for the court were:

> (1) the early hour of the search and interrogation (6:25 AM); (2) the presence of eight officers in the home; (3) that the defendant was confronted with an unholstered gun in his darkened bedroom; (4) the physical control the agents maintained over the defendant at all times; (5) the length of the interrogation (ninety minutes to two hours); and (6) the coercive statements made by the interrogating agent, which seemed designed to elicit cooperation while carefully avoiding giving the defendant *Miranda* warnings.

*Id.* at 40. These facts established a level of restraint associated with formal arrest.

Although, like *Mittel-Carey*, this case involved a search warrant for child pornography executed over the course of about two hours by a large number of agents in the defendant's home, the degree of physical restraint employed makes *Mittel-Carey* distinguishable. In *Mittel-Carey,* the First Circuit found that "the level of

physical control that the agents exercised over the defendant during the search and interrogation" carried the most weight of all of the factors. *Id*. An officer woke Mittel-Carey with his gun drawn, and officers ordered Mittel-Carey around and escorted him everywhere within the apartment, including to the bathroom.

In contrast to the police domination seen in *Mittel-Carey*, the low level of physical restraint employed by the police in this case weighs against a finding of custody. Although police officers woke Mr. Billings in his bedroom, it was a reasonable hour and there was no evidence that any firearm was drawn. He was escorted downstairs and out to the porch to smoke, but officers did not "intrude upon any intimate moment or private activity." *See Hughes,* 640 F.3d at 436 (finding that escorting a suspect outside to smoke was not a level of physical restraint associated with formal arrest). While the duration of the search was approximately two hours, the questioning within that time was limited, consisting mostly of the request for the passcodes. Finally, and of critical importance, Det. Stepnick calmly told Mr. Billings that he was not under arrest and that he was free to leave. When Mr. Billings told Det. Stepnick that he wanted to go back to bed, Det. Stepnick virtually invited Mr. Billings to leave:

> Billings: I'd like to get some sleep. I was up most of the night.
>
> Stepnick: Well, you can, do you have a neighbor you can hang around with? Or is there a neighbor you can go sleep, or if you don't want to stay here, that's up to you, you just not going to go to sleep while we're here.

Stepnick Recording 07:50-08:04. A reasonable person, in these circumstances, would have understood that he was free to terminate the conversation and leave. Under the totality of the circumstances, I conclude that Mr. Billings has not established that he

was in custody at the time he attempted to invoke his right to counsel. Because the *Miranda-Edwards* protections do not apply absent a custodial interrogation, suppression is not warranted on this basis.

## II. Voluntariness

"The Fifth Amendment right against self-incrimination prohibits courts from admitting into evidence a defendant's involuntary confession." *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014) (citing *Dickerson v. United States*, 530 U.S. 428, 433 (2000)). The Government bears the burden of establishing voluntariness, the test for which is whether the defendant's will was overborne by police coercion in the totality of the circumstances. *Dickerson*, 530 U.S. at 434; *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Voluntariness factors include "the nature of the police activity and the defendant's situation," such as the length and nature of the questioning, promises or threats made by investigators, any deprivation of the suspect's essential needs, and the defendant's age, intelligence, or prior experience with the criminal justice system. *Jacques*, 744 F.3d at 809.

Mr. Billings contends that his statements were not voluntary and he points to the facts that: (1) the police were not invited into the home; (2) they roused Mr. Billings from sleep; (3) they informed him of the nature of their search and told him that they were going to "rip the place apart" and "take everything"; (4) they tricked him into giving his passcodes with the pretext that Ms. Presby needed the phone to call her doctor; and (5) they led Mr. Billings to believe that he had no choice but to provide the passcodes. Def.'s Mot. to Suppress at 5-6; Def.'s Reply at 1-2 (ECF No. 40).

9

I turn first to Mr. Billings's personal circumstances. He is mature, with some prior exposure to the criminal justice system. *See* Gov't's Ex. 2. There is no evidence of limited intelligence, but Mr. Billings was groggy from having been roused from sleep. Def.'s Reply 2. Hearing Tr. 28:13-19 (Dec. 7, 2017). Mr. Billings also states that after the officers said they could "take everything," he believed he had "no choice" but to provide the passcodes. Def.'s Mot. to Suppress 5-6. Although Mr. Billings's mental state is relevant, it must be evaluated in conjunction with the police conduct because "[i]n the context of the voluntariness of a confession, a defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness." *United States v. Palmer*, 203 F.3d 55, 61-62 (1st Cir. 2000); *see also United States v. Turner*, 926 F.2d 883, 888 (9th Cir. 1991) ("Turner's statements were not involuntary solely because he had just awakened. Coercive conduct by police must have caused him to make the statements. Merely awakening a suspect to arrest him is not coercive conduct.").

Examining the police conduct, much of it was safely in the non-coercive category. Det. Stepnick spoke in a calm voice and invited Mr. Billings to go somewhere else to rest. His questioning of Mr. Billings was intermittent during the search, and there is no evidence it was prolonged or haranguing.

Mr. Billings argues that the "ruse" that Ms. Presby needed a phone to call her doctor was coercive conduct. It is well established that some degree of deception during interrogation is permissible, while more "aggravated types of police chicanery can render a confession involuntary." *Hughes*, 640 F.3d at 439. Evidence of the

10

exchange between Det. Stepnick and Mr. Billings indicates that it was direct and brief, without any misrepresentation of urgency. Ms. Presby needed her phone to cancel an appointment, not to summon emergency medical care, which was already at the scene. Further, the ruse argument does not extend to the ZTE passcode because Det. Stepnick asked Mr. Billings to unlock the ZTE without any deception. To the extent that Det. Stepnick employed trickery, it did not reach the level of "aggravated chicanery," sufficient to render a confession involuntary.

The more interesting question is whether Det. Stepnick's continued questioning of Mr. Billings after he requested a lawyer was coercive. When Mr. Billings requested a lawyer, Det. Stepnick replied, "[o]kay, okay, good enough. Um, then we won't talk to you anymore, then. Okay?" Stepnick Recording 06:50-07:10. Moments later, Det. Stepnick asked Mr. Billings a question intended to elicit the passcode. Although the Defendant cites no authority, some circuit courts have found that when police read *Miranda* warnings in a noncustodial settings and then ignore a defendant's invocation of rights to silence or counsel, it can have a coercive effect. The Eleventh Circuit has explained:

> If the state were free to tell a suspect that he had the right to an appointed lawyer, but could, while continuing to interrogate, refuse to provide the lawyer on the ground that the suspect was not actually in custody, the suspect would be led to believe that no request for counsel would be honored. The coercive effect of continued interrogation would thus be greatly increased because the suspect would believe that the police "promises" to provide the suspect's constitutional rights were untrustworthy, and that the police would continue to violate those rights as they wished, regardless of assurances to the contrary.

*Tukes v. Dugger*, 911 F.2d 508, 516 n.11 (11th Cir. 1990); *see also United States v. Bautista*, 145 F.3d 1140, 1150-51 (10th Cir. 1998) (same), *cert. denied*, 525 U.S. 911

(1998); *c.f. United States v. Serlin*, 707 F.2d 953, 958 (7th Cir. 1983) (voluntariness consideration included continued noncustodial questioning after suspect stated desire not to cooperate).

Here, Det. Stepnick did not read Mr. Billings his *Miranda* rights, but he did represent that the officers would not talk to Mr. Billings anymore after he requested counsel. This response could reasonably suggest to a suspect that he had a right to counsel and that he had effectively invoked it. Continued questioning therefore had some coercive effect, which I consider in my assessment of voluntariness. In the totality of the circumstances, however, these facts are not sufficient to establish that Mr. Billings's will was overborne. Det. Stepnick otherwise spoke in a calm voice, kept his firearm holstered, invited Mr. Billings to leave while the search took place, and asked Mr. Billings only a few, limited questions. Although the continued questioning of a suspect in a noncustodial setting who has requested to speak to an attorney warrants scrutiny, I conclude that in this instance the Defendant's will was not overborne and the provision of the passcodes was voluntary.

### III. Scope of Warrant

Finally, Mr. Billings argues that the passcodes should be suppressed because the warrant did not specifically authorize the seizure of the passcodes. Def.'s Mot. to Suppress 5. Search warrants of course must articulate the items to be seized. *United States v. Upham*, 168 F.3d 532, 536 (1st Cir. 1999). The Government responds that Det. Stepnick did not seize the passcodes under the authority of the warrant, that his asking for them did not somehow circumscribe the warrant, and that the request for the passcodes is governed by the Fifth Amendment. Gov't's Opp'n 5 (ECF No. 39).

Either the passcodes are things that can be seized under a warrant if specified or they are communications, the voluntariness of which may be disputed. The passcodes here were known in Mr. Billings's mind and were entered and stated by Mr. Billings. Accordingly, I agree with the Government that their admissibility is governed by the defendant's right to protection from self-incrimination and due process and not by the Fourth Amendment warrant requirements.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's motion to suppress.

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 3d day of January, 2018.